[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON (1) PLAINTIFF'S MOTION FOR CONTEMPT AND (2) DEFENDANT'S MOTION TO MODIFY ALIMONY
These parties were married on December 15, 1952. During the course of their 26 year marriage, they had four children. Their marriage was dissolved on May 15, 1979. The decree of dissolution incorporated the terms of a separation agreement dated March 21, 1979. Those provisions of the agreement and judgment which concerned alimony were modified by another agreement between the parties in December, 1982.
Under these agreements, the defendant was to pay to the plaintiff, "during his lifetime until her death or remarriage, or until his retirement. . .," the sum of $2725 per month, adjusted for an additional amount by the lesser of a percentage of increase in his base salary (which is defined as being his salary less bonus) or any increase in the Consumer Price Index (CPI).
These alimony payments were to be reduced in the event the plaintiff had earned income from any source in excess of $15,000.00 or a combination of earned and/or unearned income in excess of $30,000.00, adjusted by the cost of living increase. Under these circumstances, the defendant's alimony obligations would be reduced in the following year by "$.50 for every $1 which the Wife earned or received over those limits."
Paragraph 4.5 of the March 21, 1979 agreement provided that: "If the Wife is still entitled to receive alimony at the time of the Husband's retirement, she shall cease to receive payments . . . [as indicated above] . . . and the Husband shall, from and after the date of his retirement, pay to the Wife as alimony one third (1/3) of his `annual income' as hereinafter defined. The Husband and Wife shall consult with respect to the manner in which the Husband shall elect to receive his retirement income from his employer, and if the parties are unable to reach agreement, the matter shall be submitted to and determined by the Superior Court for the Judicial District of Fairfield at Stamford."
The plaintiff has been employed since the time of the dissolution decree. The defendant was employed at Westinghouse CT Page 8473 Electric Corporation until his position was severed in November, 1986. He received as severance pay $147,714.74 in 1987 and $120,000.00 in 1988. The amount was calculated as a lump sum present payment he would have accumulated had he stayed at Westinghouse until age 60.
For the calendar year 1988, the defendant paid to the plaintiff alimony at the rate of $3,065.33 per month. The defendant has made no payment of alimony to the plaintiff since January 1, 1989.
On September 22, 1989, the plaintiff filed a motion for contempt alleging (1) that the defendant failed to pay the alimony in accordance with the judgment of May 15, 1979 and the agreement of March 21, 1979 and (2) that the defendant failed to provide proof that he had named the plaintiff beneficiary of a certain life insurance policy.
On October 18, 1989 the defendant husband filed a motion to modify his alimony obligation and requested the order be retroactive to January 1, 1989. On December 4, 1990 the parties stipulated that the court hearing the motion would enter its order retroactive to December 4, 1989, but that the defendant reserved his right to argue that the order be retroactive to January 1, 1989 and plaintiff reserved her right that it not be retroactive to a further date. The motion to modify is also a subject of this hearing.
When the matter came before the court in March, 1991, the defendant advised the court and the plaintiff that he was seeking relief on the grounds that he is "retired" under the provisions of the separation agreement. The defendant's claimed that upon his attaining age 60 in November, 1990 he has retired for purposes of the provisions of Paragraph 4.5 of the Separation Agreement.
The plaintiff expanded her motion for contempt to allege that the defendant failed to irrevocably designate her life insurance beneficiary of his TIAA-CREF pension benefits and that the defendant had received retirement funds (being "severance" payments in 1987 and 1988) and failed to consult with the plaintiff as to the manner in which he was to receive them.
Thus, the matters for decision before the court are the plaintiff's motion for a finding of contempt and appropriate relief including award of attorney's fees because of arrears of alimony, and defendant's failure to maintain life insurance as required by Article VII of the separation agreement. CT Page 8474
In addition, the court has under consideration the defendant's motion to modify and terminate the alimony payments. The hearings on these claims continued sporadically through May, 1991 with trial briefs submitted on June 4, 1991.
 I.
The court will address first the defendant's motion for modification and termination of alimony.
The court finds that despite the parties' foresight in planning for the plaintiff's employment and defendant's retirement, there is nothing in the agreement or decree that would prevent the parties from seeking modification of certain provisions, including alimony as authorized by Connecticut General Statutes, Sec. 46b-86.
The defendant husband claims to have proven that there are several substantial changes in circumstances, including:
1) the husband's loss of employment;
2) the plaintiff's earnings above the threshold amount;
3) the plaintiff's substantial increase in assets;
4) the husband's decrease in income;
5) the inequity of the defendant paying alimony to the plaintiff such that her income would then exceed the husband's; and,
6) the plaintiff's ability to meet her expenses on her own income.
THE PARTIES' ASSETS
The defendant claims that a comparison of the assets of the parties would indicate that the plaintiff has in excess of $535,000. This total includes approximately $235,000 of equity in her home and $140,000 as the current pre-tax value of her tax deferred annuity and IRA plans. The additional $160,000 is primarily securities or mutual funds. The defendant claims the asset value would approximate $565,000, using $310,000 as appraised value for her home. In addition, she may expect future retirement pay from Bridgeport Hospital.
On the other hand, the defendant claims he has, after payment of liabilities, assets of $209,100 as reflected on his affidavit plus $60,000 increase in his IRA from that listed on CT Page 8475 the affidavit for a total of $269,100 in net assets.
The plaintiff asserts that these figures are misleading. First of all, she has inherited, since the time of the parties' divorce, approximately $150,000. This inheritance occurred at two different times, 1982 and 1987. The plaintiff asserts that were it not for this inheritance, she would have minimal if any liquid funds at present.
The plaintiff lives in the same house she owned at the time of the divorce. The only addition to her assets is her tax deferred annuity and IRA plans, which will not be available to her until her retirement.
Secondly, the defendant in stating the value of the plaintiff's assets to be $535,000, ignores the tax consequences which apply to the IRA and tax deferred annuities of Mrs. Dorsett. The defendant claims these assets are valued at approximately $140,000. In making such claims, he fails to take into account that these funds are to be subject to federal and state tax upon withdrawal, penalties on early withdrawal, and that their true value is approximately $95,000, as stated in the plaintiff's affidavit. (Although, as to this claim, the court believes the 20% offset used with the defendant's assets is more appropriate. This would bring the evaluation to approximately $112,000.)
The plaintiff claims that more significant is the evidence before the court concerning the defendant's assets which have increased substantially since the divorce, when they were listed as $74,548. His assets are not less than the plaintiff's as claimed in this court proceeding; rather they are significantly greater.
While the defendant's current affidavit lists assets at $223,611, the plaintiff claims the court should consider that the defendant's New York Co-Op, as the defendant's testimony indicated, has a present market value of $325,000, which is more than the value stated in his affidavit. In addition, although he claims only a one-half interest in that dwelling he did transfer the other one-half interest to his present wife, Beatrice, during the pendency of this case, without consideration. Thus, the value of this Co-Op, including the one-half transferred to Beatrice Dorsett, should be stated at a net value of $252,000.
In addition, the court should consider the value of his retirement plan at TIAA-CREF. The current value of the plan is approximately $750,000 from which the defendant could immediately withdraw approximately $150,000 in cash. Since, the defendant's CT Page 8476 calculation of Judith Dorsett's assets includes her retirement fund as an asset, and his should be included to create a true comparison.
Mr. Dorsett has significantly undervalued one of the investments in his IRA account. His testimony was to the effect that there was an asset in his IRA (Carrington Laboratories) which on a present basis had a value of $154,000 (i.e., fourteen thousand shares at $11.00 per share). As the defendant conceded, this is $60,000 more than his affidavit value.
Finally, the evidence indicates a clear pattern of the defendant transferring assets from his name to his current wife's name in addition to the transfer involving the New York Cooperative apartment. The defendant's testimony indicated that he has transferred into the name of Beatrice Dorsett in excess of $230,000 of additional assets over the last few years, primarily from his Westinghouse profit sharing plan. The testimony indicates that of this amount, some was used to purchase a $20,000 automobile registered to Beatrice Dorsett and to pay $80,000 for retirement living accommodations in Sarasota, Florida for his present wife's mother.
If these adjustments to Mr. Dorsett's assets are considered, it would be fair to evaluate the defendant's current assets as having a pre-tax value of about $1,350,000. If the TIAA-CREF and IRA values are reduced for tax considerations, the gross asset value would be reduced by $180,000 (20% of $900,000).
The court believes that these factors should be considered in comparing the present assets of the parties. The defendant's real assets are substantially greater than those of the plaintiff. In any event, there has been no substantial change in the ratio of the parties' assets from that at the time of the dissolution.
THE PARTIES' INCOME
THE DEFENDANT'S RETIREMENT INCOME
As to the defendant's retirement income, he claims that applying the factors of C.G.S. Sec. 46b-82, he is age 60, he is in poor health, unemployed, with little if any ability to acquire additional income in the future, whose source of income is primarily fixed and who is able to meet his basic living expenses.
The defendant asserts that if he were permitted to take his retirement benefits as requested, his current annualized income will be $72,000 gross and $52,800 net after taxes. As the CT Page 8477 defendant has testified, he has elected this method because it provides the best long term security, protects against inflation and increase over time so as to partially replace his inevitable loss of directors' fees.
The plaintiff, on the other hand, denies that modification is warranted based the defendant's claim of a reduced income during retirement. Rather, the evidence demonstrates that the defendant's retirement income is similar to that which he had at the time of the dissolution and therefore is not a basis for modification. Additionally, it is the plaintiff's claim that the court should look not only at defendant's claimed retirement income but at the defendant's income potential during retirement.
The plaintiff's analysis is based upon the following justifiable claims.
Even though the defendant is electing to be "retired" which would invoke the provisions of Paragraph 4.5 of the agreement, he is not precluded from working and generating additional income. The definition of income in Paragraph 4.6 includes income from wages and/or his business ventures. He operates a business entity known as Dorsett-McCabe which provides investment services. The firm had gross income in excess of $53,599 in 1990 and that Mr. Dorsett pays substantial personal expenses through this business entity such as entertainment and membership fees at Wee Burn Country Club in Darien as well as his medical insurance of more than $10,000 per year. The court concludes as claimed by the plaintiff that at a minimum Mr. Dorsett benefits to the extent of $15,000 from this entity by payment of these expenses.
The defendant earns $27,000 per year from director's fees.
The defendant has available to him income from his TIAA-CREF retirement plan. He projects this income at $45,384.00 per year on one payment option which he prefers. Although there are numerous payment options, he has elected the payout of income from TIAA-CREF which would best protect himself and his present wife.
The plaintiff claimed that the income potential from defendant's TIAA-CREF retirement account and IRA account is greater than that which the defendant showed on his affidavit.
Mr. Dorsett did testify that to achieve optimal financial planning, that he would hope to invest 50% of his assets in fixed income and 50% in equities to protect against inflation during retirement. The court also concludes that based upon that CT Page 8478 breakdown, Mr. Dorsett has retirement assets of approximately $900,000, consisting of the $750,000.00 in TIAA-CREF accounts and approximately $150,000 in his IRA account, which he could, by internal transfers from CREF to TIAA invest in such proportions.
The plaintiff claims to have demonstrated that the defendant could earn between 8% and 10.5% on the fixed income portfolio at TIAA and that at a minimum he expects to obtain a yield on his CREF equities — which exceeds fixed income. Mr. Dorsett acknowledged that the annual income yield (in addition to appreciation) in the equity portion of his account at CREF and his IRA account would be reasonably project at 7%. Thus the plaintiff asserts that the defendant's retirement income, assuming an investment of 50% fixed income and 50% equity would be as follows:
$450,00 at 9% (average) or 40,500 per year
$450,00 at 7% = 31,550 per year
The plaintiff claims that the defendant's total income from all sources should be determined to be $114,000 by proper investment of his retirement funds to balance income and growth as he suggested. This would include the expenses paid by Dorsett-McCabe of $15,000.00 director's fees of $27,000 and TIAA-CREF and IRA income of $72,000.
The defendant's income at the time of the dissolution appears to have been approximately $106,000. The plaintiff claims that the defendant's retirement income potential does not support his claim for modification.
The court accepts the defendant's assertion that TIAA-CREF income is $45,384.00 and assumes a 7% income from defendant's IRA account. Even on this basis, his actual retirement income would be $97,884.00, allowing again for the expenses paid by Dorsett-McCabe at $15,000.00, director's fees of $27,000, TIAA-CREF income of $45,384.00 and IRA income of $10,500. This is not a substantial change of income claimed at the time of the dissolution decree.
Mr. Dorsett also has the added benefit of additional sources of income from assets which he has set aside in his current wife's name.
Testimony indicates that Beatrice Dorsett came to the marriage with approximately $75,000.00 in assets in 1981. At the present time she has assets of over $400,000.00, attributable in substantial part to the defendant's transfers to her and his management of that portfolio. CT Page 8479
Finally, while Mr. Dorsett is claiming retirement for purposes of TIAA-CREF distributions, he has been involved in the operation of his investment business which has income. He retains the ability to generate income from business or other employment without losing his retired status under the agreement. He is only 60 years old and, despite his health problems should still be able to earn compensation.
THE PLAINTIFF'S INCOME
The defendant claims that the plaintiff who is in good health, is fully employed in a secure position with six years or more of employment until retirement. Her income and benefits are steadily increasing with her education and experience.
In discussing the plaintiff's income, the court is of the conclusion that for the purposes of the parties' agreement and the decree, her gross income does not exclude tax-deferred annuity contribution. Unlike the defendant's bonus which is specifically excluded from consideration as income, there is no such exclusion attributable to the defendant's income.
Her income is approximately $43,000 from the Bridgeport Hospital, $10,000 from interest and dividends, and $3,000 income from additional consulting, to a total of $56,000.00. It is reasonable to assume an after-tax amount of $48,000.00 (using the total 1990 tax paid of $4,450 and the Social Security tax paid).
Plaintiff represents on her affidavit to the court that her expenses total $4,923 per month. Although some of the expenses, such as allowance for car replacement and for vacations are not now actually being incurred. These figures, case the defendant to describe the plaintiff, Judith Dorsett, as physically, mentally and financially capable of handling her own affairs independently. The defendant, taking into account her assets as well as her income, characterizes her as a wealthy woman with financial security and in no need of further support.
However, the plaintiff asserts the defendant should not prevail on his modification request because the plaintiff has income from her employment. This factor was provided for in Paragraph 11.2 of the parties' separation agreement, which provides for automatic reduction in defendant's alimony payment the plaintiff's income exceeds certain amounts. This provision applies whether the defendant is employed or "retired."
The plaintiff who is 59 years old, with some present health problems, posits that she is also nearing her retirement. While CT Page 8480 she currently has gross earnings of $56,000.00 per year, she claims that in a reasonably short period of time she too will be of retirement age and her earnings from employment will evaporate. At that point she will be solely dependent upon her investment/retirement income and alimony from the defendant.
She further claims that if one were to attribute a similar investment pattern by Mrs. Dorsett to that espoused by her former husband, i.e., 50% income and 50% equities, the average return would be approximately 8% on her then liquid assets of $297,000 (which includes her deferred annuity available upon retirement). This would generate a pre-tax income from assets of approximately $24,000. per year [calculated as follows: total pre-tax assets -$535,000 less real estate and auto of $238,000 = $297,000 invested at 8%, or $23,760. rounded to $24,000]. The plaintiff claims it was not the contemplation of the parties that Mrs. Dorsett should have income of $24,000. while Mr. Dorsett has income of $114,000. in his "retirement." The court believes that the defendant's retirement income would presently be about $97,845.00.
The plaintiff claims that if the defendant paid the 1/3 of that retirement income to the plaintiff, as required by the agreement, she would have an income of $57,000 and $3,600.00 hospital retirement benefit and the defendant would have left an income of $67,000.00.
Of course, this postulates her retirement income. The plaintiff's presently employed. Her gross income is $56,000.00. If the defendant's liability were 1/3 of his income, or $32,628.00 less a credit of $15,079.00, he would be liable for alimony of $17,549.00. [The credit assumes a CPI wage base of $15,000.00 x 172.28 CPI = $25,842.00, which when subtracted from $56,000.00 = $30,158.00. This divided by 1/2 leases a credit to be applied against the 1/3 of $15,079.00].
The plaintiff would have $73,549.00 before taxes, while the defendant would be left with $80,296.00.
However, as the plaintiff has demonstrated, the defendant is in a better position than the plaintiff because:
(a) The plaintiff is working full time to achieve her income while the defendant is not.
(b) The defendant's income does not include that which is attributable to assets gifted to his present wife Beatrice Dorsett or her other assets, which income is available to help defendant meet his expenses. CT Page 8481
(c) Plaintiff's income from employment will terminate upon her retirement. If she elects retirement at age 60 her pension from Bridgeport Hospital of $3,600.00 per year, plus, her additional investments income including that from her tax deferred annuity and IRA which will be $24,000.00 per year, making her retirement income much less than her present income.
CONCLUSION ON THE MOTION TO MODIFY
The defendant has requested a rather draconian relief: termination of alimony. The court concludes that the defendant has not presented such substantial change in circumstance, in proportion to the circumstances that existed at the time of the dissolution decree, as to warrant that relief which is so contrary to the plan and intentions manifested in the agreement as adopted in the decree.
It may be that he might be entitled to a modification of the percentage of his retirement income that he must devote to alimony, but he has presented no information which would allow this court to modify that percentage except arbitrarily.
The court sees no impediment in the agreement and decree to the defendant electing the TIAA-CREF and IRA payouts he has selected and to that extent he may control the amount of alimony he must pay. Otherwise, the motion for modification by termination of the alimony is denied.
 II.
As to the motion for contempt, since the court finds no basis for modifying the alimony order, the court concludes that the defendant is liable for the payment of alimony under the terms of the decree and the modified agreement. To clarify the issue, the court finds that the payments which the defendant received from Westinghouse in 1987 and 1988 were for severance pay or salary and were not retirement funds. The court also concludes that for purposes of the agreement and the decree, the defendant retired as on November, 1990. Until that time, he was obligated under the provisions of Paragraph 4.2 of the agreement as modified. For any period after that the defendant is obligated under paragraph 4.5 of the agreement.
The court also finds that the plaintiff had not conformed to the agreement by keeping the defendant informed of her income and that the defendant is entitled to a CPI credit against alimony though 1989 of $28,952.00 as computed on defendant's exhibit attached to his memorandum and for 1990 an additional credit of $8246.00 to a total credit of $37,198.00. CT Page 8482
Subject to mathematical correction, the alimony obligation for 1989 and 1990 through October 31, 1990 equals $67,437.26 [$3065.33 x 22] less the credit of $37,198.00 or $30,239.26. From November 1, 1990, the defendant's obligation is to pay one-third of his income as defined in paragraph 4.6. Since the defendant has not drawn against his retirement funds, the arrears to date must be computed by the parties and submitted to the court for approval or hearing in the event of failure to agree.
The plaintiff has suggested that the arrears be paid in two lump sums, one-half within 30 days of this order and the balance by January 15, 1992. This will be the order of the court unless the parties agree on another method of payment.
Because the court finds that the parties had been involved in extensive discussion to resolve the question of alimony, because the defendant had made a good faith offer of a lump sum payment in lieu of further periodic alimony, and because the plaintiff herself was derelict in her own obligations under the agreement, the court will not find the defendant in contempt on this issue.
 III.
Under the agreement and decree, the defendant was obligated to maintain TIAA-CREF Group Life insurance with a face value of $168,000 and to irrevocably designate the wife as the primary beneficiary thereof until her death or remarriage and to maintain this group insurance at that amount if available, or otherwise to maintain her as beneficiary of a policy in the minimum amount of $100,000.00. The defendant has not literally complied with this requirement.
The defendant had transmitted a letter of January 1, 1986 to the plaintiff indicating compliance with the court order by providing that his estate was the beneficiary of the life insurance and notification to his current wife and estate attorney of plaintiff's claim for $100,000 against his estate.
By providing for the plaintiff in this manner the defendant claims adequately protected her interest in the event of his death and insured her in accordance with the provisions of the agreement and judgment.
The plaintiff next alleges by a motion of March 1, 1991, that the defendant husband be in contempt for his failure to name his wife irrevocable beneficiary of the TIAA-CREF retirement funds. CT Page 8483
The defendant asserts that the judgment and agreement contain mutually exclusive terms in that the plaintiff was entitled to this benefit only so long as she did not remarry, or was entitled to receive alimony, or Mr. Dorsett's retirement; and at the same time to the obligation to "irrevocably" designate her as beneficiary. If Mr. Dorsett irrevocably designated her as beneficiary then said designation would apply regardless of the occurrence of any of the contingencies. Mr. Dorsett was left with no reasonable alternative than to designate his estate as beneficiary and make his estate obligated to pay plaintiff so long as no contingency was then operable. In his letter of January 1, 1986 he advised his wife of this arrangement of which she failed to object until March 1991. Plaintiff has been in no way harmed by this arrangement, as in Mallory v. Mallory, 207 Conn. 48, 539 A.2d 995 (1988), the defendant claims that the inability of a party to obey an order or the court is a good defense to the charge of contempt.
The defendant has breached the literal requirements of the insurance provisions. The court will accept the defendant's claim that he acted in good faith, but will direct that he provide the plaintiff with proof of the fact of his insurance and proof of his notice to his present wife and to his estate attorney of the fact of the claim against the estate.
 IV.
The plaintiff claims attorney's fees under the agreement and decree. Because there was no specific discussion of this claim at the hearings and because the defendant should have an opportunity to address this issue, the court will reserve decision on this motion and require the defendant to reclaim the motion for hearing.
 V.
This court therefore finds that the defendant is in arrears on the payment of alimony in the amount of $30,239.26 through October 31, 1990 and directs the payment or the arrears in two equal installments, the first within 30 days of this order and the second by January 15, 1992.
The court also finds that the defendant is obligated to pay alimony in accordance with the paragraph 4.5 of the agreement since the date or his retirement for TIAA-CREF purposes on November 8, 1990. The parties are directed to compute the arrears once the defendant has completed the election of payment as addressed in the section on defendant's income above and submit a proposed schedule for payment of these arrears. If the parties cannot agree on such a schedule, the plaintiff is CT Page 8484 directed to bring the issue before this court.
The defendant is directed to furnish the plaintiff with proof of insurance in the minimum amount of $100,000.00 with his estate designated as beneficiary and proof of notice of claim against the insurance given to his present wife and his estate attorney.
Pending compliance with these orders, the court declines to find the defendant in contempt for the reasons above stated.
NIGRO, J.